UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

GARY McMULLEN,                    :
          Plaintiff         :
                            :
        v.                        :        CIVIL NO. 1:15-CV-2385
                            :
JAMES MATTIS, SECRETARY OF        :
DEFENSE,                          :
          Defendant        :

M E M O R A N D U M

I.        *Introduction*

Plaintiff Gary McMullen is suing the Defense Logistics Agency (DLA), an

agency of the Department of Defense (DoD), for employment discrimination on the basis

of age and disability after he was interviewed and turned down for a promotion to a Realty

Specialist position.  Before the court is the Government's[1] motion (Doc. 22) for summary

judgment.  The Government argues that no record evidence connects Plaintiff's non-

selection for the Realty Specialist position to either his age or disability.  For the reasons

that follow, we will grant the Government's motion.

II.        *Procedural History*

On December 11, 2015, Plaintiff filed a complaint against Defendant James

Mattis[2] in his official capacity as Secretary of the DoD claiming age and disability

discrimination in employment; Plaintiff was born in 1954 and suffered a leg amputation as

a result of a work-related accident in 1984.  (Doc. 1 ¶¶ 1-2, 8, 11-12).  According to the

complaint, Plaintiff has been employed by the DLA since 2003 and works as a Lead

---

[1] We often refer to Defendant in this action, the DoD, as the Government.

[2] James Mattis became the Secretary of Defense on January 20, 2017.  Pursuant to Federal
Rule of Civil Procedure 25(d), James Mattis is substituted as Defendant in place of Ashton Carter,
the former Secretary of Defense.

Supply Technician at the DLA's Susquehanna Defense Distribution Center in New Cumberland, Pennsylvania (Distribution Center). (Id. ¶¶ 9-13). The DLA is an agency of the DoD that provides worldwide logistics support to the United States' Military, the Unified Combatant Commands, and other federal agencies, foreign governments, and international organizations. (R. 197). Plaintiff's complaint alleges that, since joining the DLA, he has routinely been turned down for promotions. (Doc. 1 ¶¶ 13-15). In particular, Plaintiff alleges that when he was turned down for a promotion to Realty[3] Specialist in 2014, the DLA discriminated against him based on his age and disability in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a, and the Rehabilitation Act of 1973, 29 U.S.C. § 791. (Id. ¶¶ 16-37).

On April 21, 2017, the Government filed the instant motion for summary judgment. (Doc. 22). In its motion, the Government argues that it is entitled to judgment as a matter of law because the record demonstrates that Plaintiff's non-selection for the position[4] bears no connection to his age or his disability. (Doc. 23). Specifically, the Government argues: (1) that Plaintiff has not established a *prima facie* case of disability discrimination because the record is devoid of evidence of a causal connection between Plaintiff's disability and his non-selection for the position; and (2) that Plaintiff's age discrimination claim fails because the DLA has proffered a legitimate non-discriminatory reason for Plaintiff's non-selection which Plaintiff cannot rebut as pretextual. (Id. at 5, 7).

In opposing summary judgment, Plaintiff "does not dispute that he is unable to establish a *prima facie* case of disability discrimination," but argues that he has

---

[3] The Government confusingly refers to the position throughout its briefing and statement of facts as a "Reality Specialist." (See generally Docs. 23-24, 32). The record and position description are clear that the vacancy was for a *Realty* Specialist. (R. 197).

[4] We sometimes refer to the Realty Specialist opening as "the position" for ease of reference.

established age discrimination under the ADEA because he can rebut the Government's non-discriminatory reason as pretext for illegal age discrimination. (Doc. 29 at 4). Specifically, Plaintiff argues that the selection process for the position was a "sham" and was "designed to conceal an illegal, discriminatory motive." (Id. at 15).

III.      *Standard of Review*

Federal Rule of Civil Procedure 56 permits a court to enter summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

A party moving for summary judgment has the initial burden of stating the basis for the motion and identifying those portions of the record—depositions, documents, affidavits, admissions, interrogatory answers, or other materials—that it believes demonstrate an absence of a genuine dispute of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145 (3d Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Conoshenti, 364 F.3d at 140 (quoting Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)). In

assessing whether the moving party satisfied its burden, "we do not engage in credibility determinations, and we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." Pearson v. Prison Health Serv., 850 F.3d 526, 533 (3d Cir. 2017) (internal citations omitted).

Once the moving party shows an absence of evidence to support the nonmoving party's claims, then the nonmoving party must rebut the motion with facts in the record and cannot rest solely on assertions in the pleadings. See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). The nonmoving party must present affirmative evidence that must be adequate as a matter of law to sustain a judgment in its favor; the evidence must not be colorable, conclusory, or speculative. Davis v. Pa. Tpk. Comm'n, 204 F. Supp. 3d 793, 800 (M.D. Pa. 2016) (citing Anderson, 477 U.S. at 249-50). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

IV.     *Background*

Judged against these legal guideposts, we review the record facts and draw all reasonable inferences in a light most favorable to Plaintiff. The following is the record for purposes of summary judgment based on the parties' statement and counter-statement of material facts, along with the evidence submitted in support.

A.      *Plaintiff*

Plaintiff was born in 1954 and has had a disability since 1984, when his right leg was amputated up to the knee as a result of a work-related accident. (R. 35-37; Doc. 29-1 ¶ 3). In 1985, Plaintiff received his real estate license and worked as a full-time

realtor for over one year.  (Doc. 29-1 ¶ 5).  Plaintiff then worked as a realtor "on the side" while serving the Adams County Sheriff's Department as a deputy sheriff for fifteen years. (R. 10-12).  On December 3, 2003, Plaintiff was hired by the DLA at the Distribution Center.  (R. 9; Doc. 29-1 ¶ 1).  Plaintiff was originally hired as a "scrapper," then worked as an airline of communication builder for one year, and then worked as a transportation assistant for another year.  (R. 11).  Since 2006, Plaintiff has served the DLA as a Lead Supply Technician and has worked in that capacity for over ten years.  (R. 10; Docs. 29-1 ¶ 4; 29-2 at 65-67).  Upon being hired in 2003, Plaintiff stopped working as a realtor and put his real estate license in escrow; the license later expired "because [he] did not use [it]."  (R. 13; Doc. 29-1 ¶¶ 6-7).

        B.        *Realty Specialist Opening & Behavior Based Interviewing*

On June 24, 2014, the DLA posted a job opportunity announcement (JOA) for a Realty Specialist at the Distribution Center.  (R. 197-201; Doc. 29-1 ¶ 8).  According to the JOA, the Knowledge, Skills, and Abilities (KSAs) required for the position included: "knowledge of a wide range of real estate principles, concepts, and practices"; written and oral communication skills; and the ability to "analyze requests for property" and to "research, negotiate, and enter into and terminate permits, licenses, leases, and other real estate instruments."  (R. 199).  Beyond these broad pronouncements, the JOA provided specific job duties for the position, noting that a Realty Specialist performs a "wide variety of duties relative to the acquisition, management and disposal of real property," including: ensuring DLA real estate instruments were accurate and current; updating data in the real estate module of an Enterprise Business System; negotiating contracts, leases, and agreements; interpreting and applying laws and regulations relevant to DLA real estate

transactions; conducting inventories, utilization surveys, and/or compliance inspections of new construction; offering property management recommendations; and providing real property management and financial accountability assistance to the DLA's installation support director. (Doc. 29-1 ¶¶ 9-10; R. 197-98, 205-07).

John Carson was ultimately responsible for selecting the successful applicant for the position. (Doc. 29-1 ¶ 64; R. 123, 292). Carson relied solely on the recommendations of Mary Ellen Hotovcin and Patricia Essig in selecting a candidate. (Doc. 29-1 ¶ 67; R. 237, 294, 299-300). Hotovcin was born in 1951 and served in a supervisory capacity for the DLA as the business office chief at the Distribution Center until she retired in September 2016. (Doc. 29-1 ¶ 12; R. 103-07). Essig, the outgoing Realty Specialist at the Distribution Center, was supervised by Hotovcin, served in that role from 2012 to 2016, and was sixty-two years old during the selection process to fill her position. (Doc. 29-1 ¶ 13; R. 160, 250-51).

The JOA for the position advised candidates that their applications would be "reviewed to ensure you meet the basic eligibility and qualifications requirements," and that "[a]pplicants that are found among the most highly qualified may be referred to the hiring official for consideration, and you will receive a notification of referral." (R. 199). According to the JOA, the selecting official "may choose to conduct interviews," and "[i]f interviews are conducted, DLA uses a technique called Behavior Based Interviewing (BBI)." (R. 199). These pronouncements comported with the policies of the DLA's Merit Promotion Program. (R. 178-80).

BBI "is a structured, practical interviewing approach" during which interviewees are asked to recount their behavioral responses to certain scenarios. (R. 54-

97, 184, 305). BBI gauges how individuals "think on their feet" and "react in different situations." (R.109). BBI was considered by the DLA to be "a best practice for ensuring that candidates are selected based on the competencies needed to do the job." (R. 184). The "premise behind BBI is that past behavior predicts future performance." (Id.) Since October 12, 2005, BBI was established as the "uniform interviewing approach within the [DLA]." (Id.) The DLA's hiring and promotion policies mandated that "if the decision is made to conduct interviews, hiring managers will use behavior based interview techniques during the interview process." (Doc. 29-1 ¶ 24; R. 167, 180, 184).

C.      *Realty Specialist Selection Process & Plaintiff's Application*

In July 2014, Plaintiff submitted his application for the position. (R. 31-33). When he applied, Plaintiff's resume appears to have indicated that he was exempt from selective service because he was born before January 1, 1960[5]; his resume did not include that he currently worked for the DLA at the Distribution Center. (R. 14-15, 31). Believing that the position "would be basically for a realtor" and that a Realty Specialist for the DLA bought and sold, Plaintiff highlighted in his application his experience as a realtor and his education, training, and affiliations in real estate. (Doc. 29-1 ¶ 19; R. 16, 31-33).

As part of the selection process for the position, Human Resources (HR) for the DLA determined the candidates who were pre-qualified. (R. 129, 304). HR deemed eleven applicants, including Plaintiff, to be "best qualified." (Doc. 29-1 ¶ 11; R. 38, 53,

---

[5] The record contains two versions of Plaintiff's resume: one which overtly states that Plaintiff was born before 1960 and another without this information. (R. 31-33; 232-34). Neither party explains the discrepancy or clarifies which resume was reviewed during the selection process. In response to Plaintiff's requests for admissions, the Government admitted Plaintiff's assertion that the resume *without* the information was "submitted by [Plaintiff]" for the position. (R. 238). At this stage, however, we accept that Plaintiff's resume stated that he was born before 1960.

129, 178-79). The eleven candidates' resumes were made available to Hotovcin and Essig, who both reviewed them.[6] (Doc. 29-1 ¶¶ 26, 50; R. 117, 129 143, 259, 299). Hotovcin was advised by HR to do "telephone interviews since there was a large number of candidates," to narrow the candidates down to "those that you . . . would be interested in," and to then have those candidates interviewed in-person. (Doc. 29-1 ¶ 25; R. 119). After reading the applicants' resumes, Hotovcin and Essig conducted phone interviews with the eleven candidates. (Doc. 29-1 ¶¶ 12-13, 26; R. 118, 253, 256). Hotovcin decided when to conduct the phone interviews and did not give any candidates advance notice; no DLA rule or regulation required such notice. (Doc. 29-1 ¶ 27-28, 33; R. 119-20). Essig and Hotovcin conducted "cold call" interviews of the applicants from an office telephone; the phone was put on speaker so that Hotovcin could ask questions, but both Essig and Hotovcin could hear and evaluate the candidates' responses. (Id.; R. 132-33, 255-56).

In accord with the DLA's hiring policies, Hotovcin and Essig used BBI when interviewing the candidates. (Doc. 29-1 ¶¶ 21, 23; R. 124, 150-51, 254, 302, 345, 347, 352). Hotovcin was trained in BBI and had always conducted interviews using the technique. (Doc. 29-1 ¶ 22; R. 106-08,125, 253). During the phone interviews, Hotovcin and Essig asked the same four behavior based questions which were randomly selected from a list of ten possible questions. (Doc. 29-1 ¶ 34; R. 54-97, 132, 135, 254, 278). The following questions were asked of all eleven candidates: (1) Describe a time when you worked on several tasks at the same time. How did you prioritize them? What was the outcome? (3) Describe a situation in which you computerized a manual task? (5) Tell me

---

[6] Plaintiff disputes Essig's and Hotovcin's deposition testimony that they reviewed the resumes, but provides no support for his contention. (Doc. 29-1 at 13-15). He only responds that Essig looked at the resumes "the day of the interview," and that both interviewers did not fully appreciate Plaintiff's experience as a realtor. (Id.; R. 259).

about a time when you coached someone to help them improve their skills of job performance? and (8) Describe your experience in interacting with a diverse group of people and organizations.  Who were they and how did you do it?  (R. 54-97).

Plaintiff and eight other applicants were interviewed on August 7, 2013.  (R. 54-96).  Without notice, Plaintiff was called on his cell phone when he was not working. (R. 39).  When Plaintiff answered the call, he was asked if he "ha[d] a few minutes for an interview?"[7]  (Doc. 29-1 ¶ 29; R. 119-20).  Plaintiff had trouble hearing Hotovcin and Essig because of his cell phone reception and because he "was at a service station getting [his] car worked on."  (R. 22, 39, 120, 145).  Plaintiff was "shocked" when he received the call and felt obligated to answer questions rather than have Essig and Hotovcin call back because he had only received "one other interview" in fourteen years and believed that he "better take" the call "while [he had] a shot at it because [he did not] get these [interviews] very often."  (R. 21-22).  Hotovcin testified that "if [Plaintiff] would have asked to do [the phone interview] at a later time, we would have done it at a later time[,]" and that there would not have "been any repercussion if [Plaintiff] would have said this isn't a good time." (Doc. 29-1 ¶¶ 30-31; R. 146, 151).  Several candidates did the interview at a later time. (Doc. 29-1 ¶ 32; R. 70-75, 146).

Plaintiff was asked the four aforementioned questions and was not asked about the Realty Specialist position, his KSAs, or his experience in real estate.  (R. 24, 40, 240 ¶ 21-25).  According to Hotovcin, although the BBI questions were not related to the position, candidates could still explain why they would be a good fit for the position.  (Doc.

---

[7] A dispute exists as to the conversation that took place.  Hotovcin testified that candidates were asked "if they had time or if they would prefer to do it later," (Doc. 29-1 ¶ 29; R. 133), and the interview script states, "You recently applied for a Realty Specialist position . . . .  I was wondering if you had time to answer a few questions?"  (R. 53-97).  The Government concedes Plaintiff's version of events for the instant motion.  (Doc. 32 at 8).

29-1 ¶ 35; R. 151).  As Essig put it, "the person we were interviewing, their job [was] to try and slide in information that related to how they would deal with a situation like that in the profession they were trying to get into."  (Doc. 29-1 ¶ 36; R. 258).

Hotovcin and Essig scored each applicant's answers to the four questions on a scale from one to three, with one signifying a "good" score, two signifying "needs work," and three signifying "no respon[se]."  (Doc. 29-1 ¶¶ 39-40; R. 54-97, 134).  Essig and Hotovcin each filled out scoresheets and took notes concerning the candidates' responses.  (R. 54-97).  The scores were totaled for each of the eleven applicants and placed into a spreadsheet,[8] with applicants who received lower scores ranking above those who received higher scores.  (R. 53, 134, 272).  Four applicants received a total score of eight, five applicants received a total score of seven, one applicant received a total score of six, and one applicant received a total score of five.  (Doc. 29-1 ¶¶ 42-43; R. 53).

Plaintiff was one of five candidates who received a total score of seven. (Doc. 29-1 ¶ 41; R. 53).  On Hotovcin's scoresheet, Plaintiff received a total score of eight, while Essig gave Plaintiff a total score of seven.  (R. 66-67, 88-89).  In their comments for his interview, Hotovcin and Essig noted Plaintiff's experience at the Distribution Center as a Lead Supply Technician, his experience in shipping and receiving, and his receipt of a Civilian Service Award for the DLA; in particular, Essig noted that Plaintiff's resume was "not update[d]" with his leadership position at the DLA.  (Id.)

After discussing the phone interviews, Hotovcin and Essig selected two applicants for a second round of in-person interviews.  (Doc. 29-1 ¶ 44; R. 138, 161).  The

---

[8] Essig's and Hotovcin's total scores corresponded for seven applicants.  (R. 54-57, 60-65, 68-73, 76-79, 84-87, 90-95).  Where their scores were not in harmony, Essig and Hotovcin appear to have "talked about" the interview and settled on an overall score for the candidate.  (R. 271).

two candidates who received in-person interviews were William Donmoyer and Tamara Boyd-Wilson, who respectively received scores of five and six in their phone interviews. (Doc. 29-1 ¶ 45; R. 53). The nine candidates that received scores of seven or eight in their phone interviews, including Plaintiff, were not selected for an in-person interview. (Doc. 29-1 ¶ 47; R. 53). Donmoyer and Boyd-Wilson were selected based on "[t]heir answers to the questions; how quickly they answered the questions; [and] how quickly they formulated their answer." (Doc. 29-1 ¶ 46; R. 138). Both candidates' references were checked, and in-person interviews were conducted; after discussing the in-person interviews, Hotovcin and Essig agreed that Donmoyer was the best candidate to fill the position. (Doc. 29-1 ¶¶ 51-52, 62; R. 117, 141-42, 275-78). Donmoyer was forty-three years old when he was recommended for the position. (Docs. 23 at 7 n.4; 29 at 5).

D.        *Selection of Donmoyer & the Enterprise Business System*

Both Hotovcin and Essig testified that they believed Donmoyer was best qualified to fill the Realty Specialist position because of his past experience in using the Enterprise Business System (EBS). (Doc. 29-1 ¶ 53; R. 139, 141, 275-76, R. 53). EBS is a data-entry system and is the main program used in the position. (Doc. 29-1 ¶ 56; R. 139, 154, 267). EBS is a database with four modules: finance, real estate, project management, and plant maintenance. (Doc. 29-1 ¶ 87; R. 330). EBS is a "mandated system" by the DLA and "contains every bit of information [that an individual would] need to know about a building." (R. 140, 320).

When Donmoyer submitted his resume for the position, he included his past experience in EBS. (Doc. 29-1 ¶ 86; R. 225-26). His resume mentions EBS numerous times, noting that he was a member of a "development team to implement EBS (Real

11

Property . . . platform software) throughout DLA installations" and worked in EBS "to initiate new [e]ngineering projects or research open projects to request funding from DLA[.]"  (Id.)  Prior to applying for the position, Donmoyer considered himself proficient in EBS and had access to three of the four modules.  (Doc. 29-1 ¶¶ 88, 93; R. 330, 334).  A dispute exists as to whether Donmoyer used the real estate module prior to applying for the position.  (Doc 29-1 ¶ 89-90; R. 274, 330-32).  After conducting phone interviews, Essig and Hotovcin each noted that Donmoyer and Boyd-Wilson had EBS experience, with Boyd-Wilson only having "[s]ome EBS" experience.  (R. 53).  Donmoyer discussed his EBS experience during his in-person interview.  (Doc. 29-1 ¶¶ 54-55; R. 152, 274, 277).

When asked what qualifications Donmoyer possessed that caused them to recommend him for the Realty Specialist position, Hotovcin and Essig both mentioned Donmoyer's EBS experience.  (Doc. 29-1 ¶ 58; Doc. 29-2 at 35; R. 162).  According to Hotovcin, EBS was "one of the major duties" of a Realty Specialist because "[y]ou're probably working in EBS all day long."  (Doc. 29-1 ¶ 57; R. 152).  Hotovcin agreed that "Donmoyer's experience [in EBS] would be paramount to doing the work at [the Distribution Center]."  (R. 162).  Essig, who used EBS in the Realty Specialist position since she was hired for the position in 2012, also testified that Donmoyer's EBS experience "was a big plus" because she "didn't know when [she] was leaving" the Distribution Center as the outgoing Realty Specialist and she "felt [that Donmoyer] would be easier for [her] to train[.]"  (Doc. 29-1 ¶ 59; R. 267-68, 275-76).  Essig added that learning EBS was "not always easy," that hiring Donmoyer would be "a fast jump start," and that Donmoyer's EBS experience would be helpful to the position.  (R. 269, 276-77).

Finally, as selecting official, Carson agreed that prior EBS experience "would be a major benefit" for the position. (R. 296).

When Hotovcin and Essig agreed on their selection of Donmoyer, they advised Carson of their recommendation. (Doc. 29-1 ¶ 63; R. 276). Carson was not involved in the hiring process until Essig and Hotovcin came to him with their recommendation. (R. 293). Carson did not review any applicants' resumes, did not participate in interviews, and did not review Essig's or Hotovcin's scoresheets. (Doc. 29-1 ¶¶ 65-66; R. 187-88, 236).

Carson could have accepted the recommendation or rejected it and conducted his own interviews. (R. 293-94). Carson accepted the recommendation at face value and selected Donmoyer for the position. (Doc. 29-1 ¶ 69; R. 123-24, 142, 294, 298-301, 308). Carson trusted the recommendation and did not question Hotovcin's or Essig's judgment about Donmoyer's qualifications because he "had a really good supervisor [in Hotovcin] and a really qualified technical person [in Essig] as part of the interview team." (Doc. 29-1 ¶ 68; R. 319-20). As Carson put it, Essig was the "subject matter expert," and Hotovcin "was [an] experienced supervisor" and "had selected several other positions within her office." (Id.) Plaintiff was not considered by Carson for the position. (Doc. 29-1 ¶ 70; R. 318).

E.      *Plaintiff's Rejection and Real Estate Experience*

After contacting HR about his application, Plaintiff learned that he was not selected for the position and sent Carson an email asking why he was not chosen. (R. 39-41, 165). Carson forwarded the email to Hotovcin, who responded by expressing her appreciation for Plaintiff's application and stating that "[w]hile your resume was impressive

we have opted to hire a person with some knowledge of Government Real Property as well as EBS experience."[9]  (R. 165).  Plaintiff does not recall receiving this email.  (R. 40-41, 165; Doc. 29-2 at 45).

Plaintiff was not familiar with EBS prior to applying for the position, and had never used the program.  (Doc. 29-1 ¶ 60-61; R. 22-23, 41).  Plaintiff believed that the Realty Specialist job "would be basically for a realtor," and, when pressed on his understanding of the position, Plaintiff admitted that he did not understand that the DLA did not own property and explained that the JOA "didn't really specify that [the DLA does not] own property."  (Doc. 29-1 ¶ 20; R. 16-17, 31-33).

Hotovcin testified that although prior experience as a realtor in the private sector "could be" helpful to the position, (R. 132), a major distinction between real estate experience in the private sector and working for the DLA as a Realty Specialist was that the DLA did "not own any property," (see Doc. 29-1 ¶¶ 17-18; R. 129-30, 161).  According to Hotovcin, unlike a private-sector realtor, a DLA Realty Specialist "deal[s] with buildings that belong to the [military] services," and does "not sell, lease, or any of that."  (Id.)  Hotovcin added that the DLA is "a record keeping organization," cannot "sell off any property," and that a Realty Specialist primarily assists in "keep[ing] the records on all the real property."  (Id.)  As the outgoing Realty Specialist, Essig confirmed that she neither sold nor bought property for the DLA in the position and that she "d[i]dn't see" how

---

[9] Plaintiff mischaracterizes Hotovcin's email by arguing that Hotovcin admitted that Plaintiff's resume reflected that he was a "realty specialist."  (Doc. 29-1 at ¶ 50).  However, when asked why she stated that Plaintiff's resume was "impressive," Hotovcin clarified that "HR says you [should] put in [such a statement] to a person," and added that Plaintiff's resume was impressive in that he had a "real estate background," could be considered a "real estate specialist," and "everything that he does is impressive to someone."  (R. 147-48, 161-65).

Plaintiff's real estate experience in the private sector would "match up" with being a Realty Specialist for the DLA. (Doc. 29-1 ¶¶ 14-16; R. 252, 260, 265, 280-82).

Likewise, Carson testified that "having a real estate license is probably very minimally related to" the Realty Specialist position. (R. 313). Carson added that private sector residential realty experience "is normally associated with the buying and selling of houses[,]" and that the Realty Specialist position was "not [about] buying and selling houses" but is concerned with "the database management of the facilities and the financial aspects of . . . DLA distribution." (R. 313-14). Carson confirmed that the DLA does not own property and that the owning of property was restricted to the Military Departments. (R. 318). Finally, an HR specialist for the DLA testified that a private-sector realtor and a Realty Specialist were "two very different types of positions," adding that the "DLA doesn't own property" but rather "manage[s] facilities," and that a Realty Specialist is a "tracking position" that was not concerned with "actually buying and selling real estate." (R. 349).

F.        *Additional Facts Regarding Plaintiff's Age and Disability Claims*

Prior to his phone interview, Plaintiff had not met Essig, Hotovcin, or Carson. (R. 22). Plaintiff's age and disability were not discussed in his interview. (Doc. 29-1 ¶¶ 37-38; R. 18). Plaintiff never told Essig, Hotovcin, or Carson about his disability or age. (Doc. 29-1 ¶¶ 74-76, 80-82; R. 20-21). Plaintiff also never heard Hotovcin, Essig, or Carson make any comments related to his age or disability, and, more specifically, never heard them make any comments related to age or disability in connection with his application for the Realty Specialist position. (Doc. 29-1 ¶ 77-78, 83-84; R.24-26).

Plaintiff indicated on his application that he did have a disability, but could not be sure if that information was shared with Essig, Hotovcin, or Carson. (R. 18-19).

Plaintiff testified that certain employees at the Distribution Center had access to a "global" database through which other employees' personnel information (such as dates of birth) could be researched, but admitted that he had no reason to believe that Hotovcin, Essig, or Carson actually accessed this database or were otherwise aware of his age. (Doc. 29-1 ¶ 79; R. 27-28, 37). When asked why he believed age was a factor in his non-selection for the position, Plaintiff pointed only to his history of being turned down for promotions over the last decade. (Doc. 29-1 ¶ 85; R. 26-27).

Hotovcin and Essig testified that Plaintiff's age and his disability were not considered in the selection process for the Realty Specialist position; neither had any knowledge of Plaintiff's disability when they conducted the phone interview, and only Essig appears to have been aware of Plaintiff's age because of the selective service information on his resume. (Doc. 29-1 ¶¶ 48-49, 71-72; Doc. 29-2 at 34; R. 122, 152-53, 160, 282-83). Neither Hotovcin nor Essig had ever met Plaintiff and they did not have access to the candidates' personnel files. (Doc. 29-2 at 32; R. 122, 160). Essig testified that "age has no merit" in selecting a candidate for the Realty Specialist position and that she was unaware of Donmoyer's age when he was selected. (Doc. 29-1 ¶ 73; R. 283).

V.        *Discussion*

Regarding his non-selection for the position, Plaintiff raises claims of age and disability discrimination under the ADEA and the Rehabilitation Act of 1973. (Id. ¶¶ 9-37). With respect to his disability claim, however, Plaintiff no longer "dispute[s] that he is unable to establish a *prima facie* case of disability discrimination," (Doc. 29 at 4), and has essentially abandoned this claim. Based on our review of the record, we agree that he

has failed to establish a *prima facie* case of disability discrimination.  We will therefore grant summary judgment for the Government on this claim.

We turn to Plaintiff's remaining claim of age discrimination.  "The federal Age Discrimination in Employment Act prohibits employers from taking adverse action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), 'because of such individual's age.' 29 U.S.C. § 623(a)."  <u>Palmer v. Britton Indus., Inc.</u>, 662 F. App'x 147, 150 (3d Cir. 2016) (nonprecedential).  The three-part burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), governs age discrimination claims in which a plaintiff relies on circumstantial evidence.  <u>See</u> <u>Keller v. Orix Credit All., Inc.</u>, 130 F.3d 1101, 1108 (3d Cir.1997); <u>see also</u> <u>Willis v. UPMC Children's Hosp. of Pittsburgh</u>, 808 F.3d 638, 644 (3d Cir. 2015).  "Under this framework, the plaintiff must first establish a *prima facie* case of age discrimination."  <u>Willis</u>, 808 F.3d at 644.

"When a plaintiff complains of age discrimination under the ADEA based on his employer's failure to promote him, the *prima facie* case requires him to show that (1) he was a member of the protected class, *i.e.*, over 40 years old; (2) he was qualified for the new position; (3) he suffered an adverse employment decision, *i.e.*, he was passed over for the desired promotion; and (4) his employer's refusal to promote him occurred under circumstances that give rise to an inference of age discrimination."  <u>McClement v. Port Auth. Trans-Hudson</u>, 505 F. App'x 158, 162 (3d Cir. 2012) (nonprecedential).  An inference of age discrimination can be shown where the plaintiff was passed over for promotion and a sufficiently younger individual was selected; under such circumstances, "a fact-finder can reasonably conclude that the employment decision was made on the basis of age."  <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 730 (3d Cir. 1995) (finding

ten-year age gap sufficient to raise inference of discrimination and noting that no "particular age difference . . . must be shown"); see also Willis, 808 F.3d at 644.

"Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" Willis, 808 F.3d at 644 (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir.1999)). "This second step of McDonnell Douglas does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action." Id. "Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons." Id.

"If the employer satisfies this second step, the burden shifts . . . once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Id.; see also Lackey v. Heart of Lancaster Reg'l Med. Ctr., No. 16-3986, __, F. App'x __, __, 2017 WL 3189154, at *4 (3d Cir. July 27, 2017). In other words, "[a] plaintiff must show 'that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action.'" Lackey, 2017 WL 3189154, at *4 (quoting Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

At summary judgment in an age discrimination claim, it is "not enough to show that . . . age was a factor motivating the [adverse employment] decision," but rather the plaintiff must "point to summary judgment evidence supporting an inference that his age had a 'determinative influence' on the decision." Palmer, 662 F. App'x at 150 (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)). The plaintiff ultimately "must

prove that age was the 'but-for' cause of the employer's adverse decision to prevail on an age discrimination claim." Sarullo, 352 F.3d at 797 (citing Gross, 557 U.S. at 177-78).

"[M]ost cases turn on th[is] third stage, *i.e.*, can the plaintiff establish pretext." Jones, 198 F.3d at 410.  To survive a motion for summary judgment in a "pretext" employment discrimination case, the plaintiff must present "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." Palmer, 662 F. App'x at 152 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

First, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller, 130 F.3d at 1108 (quoting Fuentes, 32 F.3d at 765).  "Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Id. at 1108-09.  "The plaintiff's evidence must contradict the "core facts put forward by the employer as the legitimate reason for its decision." Kautz v. Met–Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  "[T]his standard places a difficult burden on the plaintiff." Fuentes, 32 F.3d at 765.

Alternatively, a plaintiff can show pretext "by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age was a . . . determinative factor.'" Willis, 808 F.3d at 645 (quoting

<u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644-45 (3d Cir. 1998)).

"Pointing to evidence demonstrating any of the following satisfies this second way [of proving] pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." <u>Willis</u>, 808 F.3d at 645. "Throughout this burden-shifting exercise, the burden of persuasion, including the burden of proving but for causation or causation in fact, remains on the employee." <u>Smith v. City of Allentown</u>, 589 F.3d 684, 691 (3d Cir. 2009) (internal quotation marks and citation omitted).

In this case, the parties agree that Plaintiff has met his burden of showing a *prima facie* case of age discrimination, and that the Government has proffered legitimate non-discriminatory reasons for Plaintiff's non-selection for the position. (Doc. 23 at 7 & n.4; 29 at 4). In other words, it is undisputed that Plaintiff was over forty years old, that he was qualified for the Realty Specialist position, that he suffered an adverse employment action when he was not selected for the position, and that the seventeen-year age difference between Plaintiff (sixty years old) and the candidate selected for the position, Donmoyer (forty-three years old), gives rise to an inference of discrimination. It is also undisputed that the Government has provided legitimate, non-discriminatory reasons for Plaintiff's non-selection for the position: that Plaintiff lacked EBS experience, that his previous work as a private sector realtor would not be very helpful to the position, and that Donmoyer was selected for the position because of his prior experience with the EBS database, which was beneficial to the position. (<u>See</u> Doc. 23 at 8-13).

Therefore, the focal point of the instant motion is the third step of the McDonnell Douglas framework, i.e., whether Plaintiff has satisfied his burden of showing that the Government's reasons for his non-selection are a pretext for age discrimination. Notably, in attempting to establish pretext, Plaintiff cites barely any case law and does not point to any affirmative evidence to show that age discrimination was more likely than not a determinative reason for his non-selection; in fact, age discrimination is explicitly mentioned only twice throughout Plaintiff's briefing. (See Doc 29 at 4-15). Rather, Plaintiff mostly complains about the "unfair" selection process for the Realty Specialist position and speculates that "a true merit selection process . . . would have resulted in a much different selection in this case – probably the selection of [Plaintiff]." (Id. at 12, 14).

Plaintiff argues that the selection process was "the antithesis of a 'merit selection' process," that the interviews were a "'sham,' designed to conceal an illegal, discriminatory motive," and that the selection of Donmoyer for his EBS experience was pretext. (Id. at 4, 15). In attempting to show why a rational jury would disbelieve the Government's articulated non-discriminatory reasons, Plaintiff raises a litany of fact-specific arguments. (See Doc 29 at 4-15). He argues that EBS knowledge was not a required qualification for the position; that EBS was strictly a database and was easy to learn; that none of the phone interview questions related to EBS knowledge; that the JOA should have provided notice of what would be required of candidates; that Hotovcin and Essig did not make "any meaningful inquiry" into Plaintiff's KSAs; that the BBI interviews were "the antithesis of a productive or even informative interview process" and "not an 'interview' that tested [Plaintiff's] – or any applicant's – qualifications"; that the BBI process invited subjective consideration of an applicant's answers rather than being based on

objective merit-based principles; that Plaintiff was not given advance notice of his phone interview; that the interviews should have been conducted by a hiring manager rather than Essig or Hotovcin; that Plaintiff was a "best qualified" candidate for the position; and that Plaintiff was "clearly the objectively better candidate" over Donmoyer because he "had a number of years of real estate experience[.]"  (Id.)

We find that these arguments lack merit and fail to carry Plaintiff's difficult burden of establishing pretext.  Plaintiff has not provided sufficient evidence from which a rational factfinder could reasonably disbelieve the Government's proffered non-discriminatory reasons for Plaintiff's non-selection to the Realty Specialist position.  See Fuentes, 32 F.3d at 766 ("Without going into each justification in detail, we simply note that [the plaintiff] has not succeeded in throwing enough doubt on any of those explanations so that a rational factfinder could reject it.").

The record evidence supports that the primary reason why the Government chose Donmoyer was because of his prior experience in working with EBS.  Indeed, while Plaintiff argues that knowledge of EBS was not a required qualification for the job, he admits that the job announcement specifically noted that one of the duties of a Realty Specialist was updating data in EBS.  Whether EBS was easy or difficult to learn, and whether Donmoyer had specific experience in its particular real estate module, are ultimately irrelevant because it is undisputed that Plaintiff lacked EBS experience, that such experience was beneficial to the job, and that Donmoyer possessed such experience.

In this regard, we find it noteworthy that the two candidates who were selected for in-person interviews and who received better phone-interview scores than

Plaintiff and the other unsuccessful applicants had some measure of EBS experience. Further, immediately after Plaintiff's non-selection, he was sent an email by Hotovcin which advised that they had "opted to hire a person with . . . EBS experience." (R. 165). The record therefore establishes that EBS experience was consistently a focal point for Donmoyer's selection and for Plaintiff's non-selection. Plaintiff's litany of fact-specific arguments about the alleged shortcomings of the selection process do not meet his "difficult burden" of showing pretext. Indeed, they fail to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 765.

Moreover, none of Plaintiff's arguments about the selection process even raises a specter of age discrimination being the real reason Plaintiff was not hired. Plaintiff never told Essig, Hotovcin, or Carson about his age; his age was not discussed in his phone interview; and he never heard Hotovcin, Essig, or Carson make any age-related comments. The undisputed record reveals that neither Hotovcin nor Carson even knew Plaintiff's age.

At best, the summary judgment record reveals only that Essig knew of Plaintiff's approximate age before his interview because Plaintiff's resume indicated that he was born before 1960. Notably, Plaintiff neither mentions nor relies on this fact in making his age discrimination claim; rather, the information is located in an affidavit from Essig which was appended to, but not referenced in, Plaintiff's counterstatement of material facts. (Doc. 29-2 at 34).

Even assuming Essig's knowledge of Plaintiff's approximate age, such a fact does not raise a triable issue because an employer's "mere knowledge . . . is insufficient to show pretext."  See Klimek v. United Steel Workers Local 397, 618 F. App'x 77, 80 (3d Cir. 2015); Gutknecht v. SmithKline Beecham Clinical Labs., Inc., 950 F. Supp. 667, 671 (E.D. Pa. 1996) (noting that "[m]ere knowledge of an employee's age does not constitute discriminatory animus," and finding that the plaintiff "has neither offered sufficient evidence to logically cast doubt on defendant's proffered reasons for termination of plaintiff, nor offered any evidence from which a jury could infer that discrimination was more likely than not a determinative factor"), aff'd, 135 F.3d 764 (3d Cir. 1997); Gustovich v. AT&T Commc'ns, Inc., 972 F.2d 845, 849 (7th Cir. 1992) ("Knowledge of a worker's age does not support an inference of age discrimination[.]").  Essig's knowledge of Plaintiff's approximate age is also especially insignificant when she did not have any knowledge of Donmoyer's age or whether he was younger or older than Plaintiff.

We reject Plaintiff's numerous arguments about the selection process and find that the process here was administered uniformly among all applicants for the position.  Each of the eleven candidates interviewed by phone was considered "best qualified" for the position, and each candidate was subjected to the same process that Plaintiff alleges was a sham.  All of the candidates had their resumes reviewed by Essig and Hotovcin, and none was given advance notice of the interview or asked about EBS experience, KSAs, real estate experience, or the Realty Specialist job itself.  All of the candidates had an opportunity to participate in the interview at a later time, if requested, and they were all ultimately scored on their answers to the same four interview questions.

Therefore, even if, as Plaintiff alleges, the selection process was the "antithesis of productive" and no "meaningful inquiry" was made into the candidates' KSAs, Plaintiff concedes that this process would not have "tested . . . *any applicant's* – qualifications." (Doc. 29 at 9-10 (emphasis added)). See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."). While Plaintiff disparages the interview process, he has not shown that any of the candidates for the position were treated differently. Significantly, not only does it appear that the process was uniformly administered, but there is also no record evidence as to the ages of any of the other nine unsuccessful candidates, who presumably could have been younger than Donmoyer.

Finally, Plaintiff complains that his background as a realtor should have been given greater weight, even though his real estate license lapsed more than a decade prior to the position's selection process. However, the record demonstrates that such a background was, at best, minimally related to the position. It is evident that Plaintiff's belief as to what the position entailed did not align with the actual duties of a Realty Specialist. Plaintiff believed the position "would be basically for a realtor." Yet, Hotovcin, Essig, Carson, and even an HR specialist for the DLA testified that the DLA did not own property and that a Realty Specialist would not buy or sell real estate. Although general knowledge of real estate was part of the KSAs listed in the JOA, the Realty Specialist position was ultimately a tracking position that was primarily concerned with record keeping for properties managed by the DLA.

Plaintiff appears to blame his misunderstanding of the position's requirements on the fact that they were not overtly listed in the JOA. However, not only

does the JOA refer to "property management activities/function" and utilizing the EBS database to "update[] data" in its description of the position's duties, but, even if the JOA was unclear in this regard, it was so for any candidate applying for the position. Such facts simply do not support Plaintiff's age discrimination claim and would not lead a rational juror to conclude that the DLA's reasons for Plaintiff's non-selection were a pretext for age discrimination.

*VI.*        *Conclusion*

Plaintiff has failed to carry his burden at the third stage of the McDonnell Douglas burden-shifting framework. While the DLA has provided legitimate, non-discriminatory reasons for selecting Donmoyer over Plaintiff, Plaintiff has failed to show by a preponderance of the evidence that the DLA's proffered reasons are pretextual. In other words, Plaintiff has failed to come forth with evidence—direct or circumstantial—from which a reasonable factfinder could either disbelieve the DLA's proffered reasons, or believe that age discrimination was more likely than not a determinative factor in the DLA's decision.

We will therefore grant the Government's motion for summary judgment, and will issue an appropriate order.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge